**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JIMMIE K. BEALL,** | : | |
| **Plaintiff,** | : | **Case No. 2:04-cv-290** |
| **v.** | : | **Judge Holschuh** |
| **LONDON CITY SCHOOL DISTRICT** | : | **Magistrate Judge Abel** |
| **BOARD OF EDUCATION, et al.,** | : | |
| **Defendants.** | : | |
| | : | |

**Memorandum Opinion and Order**

Plaintiff brings this action against Defendants, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated her equal protection rights, her freedom of association, and her academic freedom as protected by the First and Fourteenth Amendments to the United States Constitution. This matter is before the Court on Defendants' motion for summary judgment. (Doc. # 34).

**I. Background**

Plaintiff, a lesbian, was hired as a teacher for the 2000-2001 school year by Defendant London City School District Board of Education ("Board of Education"). (Amended Complaint at ¶ 5; Affidavit of Jimmie K. Beall at ¶¶ 2-3). Plaintiff was given a one year limited teaching contract and was assigned to teach Law and Society, Psychology and American Government. (Beall Aff. at ¶¶ 2, 4; Deposition of Jimmie K. Beall at pp. 34-36; Deposition of Jeffery A. Thompson at pp. 18-19). Plaintiff's teaching contract was subsequently renewed for the 2001-2002 and the 2002-2003 school years. (Am. Compl. at ¶ 5; Beall Aff. at ¶ 2). During those school years, Plaintiff received positive performance evaluations. (Beall Aff. at ¶ 4; Thompson Dep. at pp. 10-11). In fact, Plaintiff's Principal, Jeffery Thompson, stated that he did not have

any concerns with respect to Plaintiff's teaching ability.  (Thompson Dep. at p. 11).

    Plaintiff also notes that she was actively involved in the school community, attending numerous school functions, including community meetings, parent-teacher organization functions and levy meetings.  (Am. Compl. at ¶ 9; Beall Aff. at ¶ 5).  Plaintiff contends that, during her employment, she was open and forthcoming about her sexual orientation and often attended school functions with her life partner.  (Am. Compl. at ¶ 10).  However, Plaintiff contends that she did not discuss her sexual orientation or private life with her students.  (Id. at ¶ 11).

On March 25, 2003, Plaintiff was evaluated by Principal Thompson, who recommended that Plaintiff be rehired by the Board of Education under a three year contract.  (Beall Aff. at ¶ 6; Thompson Dep. at p. 13).  Shortly thereafter, Plaintiff met with Principal Thompson and advised him that she would be starting a unit on Civil Rights/Civil Liberties in her Government class.  (Beall Aff. at ¶ 6; Thompson Dep. at pp. 15-16).  Plaintiff advised Principal Thompson that the unit would encompass several "controversial" topics, including affirmative action, women's rights and other forms of discrimination.  (Beall Aff. at ¶ 6).

On April 9, 2003, Plaintiff showed a Power Point presentation to two of her Government classes concerning the "National Day of Silence," a day where individuals remain silent in an effort to bring attention to the harassment, prejudice and discrimination faced by gay and lesbian students.  (Beall Aff. at ¶ 7).  Plaintiff remained silent during the presentation.  (Id. at ¶ 7; Beall Dep. at pp. 46-49).  Principal Thompson explained that he was informed of the presentation and went to Plaintiff's classroom to discuss the matter with Plaintiff.  (Thompson Dep. at pp. 26-28).  Plaintiff contends that Principal Thompson became visibly agitated after viewing a portion of the

2

presentation.  (<u>Beall Aff.</u> at ¶ 8; <u>Beall Dep.</u> at p. 49).  Plaintiff also contends that Principal Thompson compared the presentation to teaching religion; Principal Thompson allegedly stated that the subject was "shaky ground" and that he would have to talk to Bob Smith, Assistant Superintendent in charge of curriculum.  (<u>Beall Aff.</u> at ¶ 8; <u>Beall Dep.</u> at pp. 52-53).  As a result, Plaintiff opted to discontinue the presentation.  (<u>Beall Aff.</u> at ¶ 8; <u>Beall Dep.</u> at p. 53).

Two days following the presentation on the National Day of Silence, Plaintiff met with Principal Thompson who advised Plaintiff that he was withdrawing his recommendation for renewal of Plaintiff's teaching contract and would, instead, recommend Plaintiff for non-renewal.  (<u>Beall Aff.</u> at ¶ 9).  Plaintiff contends that Principal Thompson stated that the reason for non-renewal was due to the uncertainty regarding the number of students enrolled in the School District for the 2003-2004 school year.  (<u>Am. Compl.</u> at ¶ 19; <u>Beall Dep.</u> at pp. 55-56).[1]

Thereafter, Plaintiff met with Principal Thompson and the chair of the Social Studies Department, Ed Maynor.  (<u>Beall Aff.</u> at ¶ 10).  At this meeting, Plaintiff was told that the reason she was not being recommended for renewal was because she was not "highly qualified" as defined by the Elementary and Secondary Education Act.  (<u>Beall Dep.</u> at pp. 58-61).[2]

Plaintiff also contends that shortly after her presentation, Defendant Thomas Coyne, Superintendent for the School District, requested a review of Plaintiff's teaching certification.  (<u>Affidavit of Thomas Coyne</u> at ¶ 12).  Principal Thompson reviewed Plaintiff's personnel file

---

[1]However, in her affidavit, Plaintiff contends that the reason given during this meeting with Principal Thompson was that she was not "highly qualified" as required by the Elementary and Secondary Education Act.  (<u>Beall Aff.</u> at ¶ 9).  In that affidavit, Plaintiff also contends that the "lack of students" explanation was given in a subsequent meeting with Principal Thompson and Ed Maynor.  (<u>Id.</u> at ¶ 10).

[2]See *supra* note 1.

and submitted a memorandum, dated April 14, 2003, to Superintendent Coyne.  (Exhibit 4,

attached to <u>Plaintiff's Memorandum in Opposition</u> (Doc. # 48-5); <u>Coyne Aff.</u> at ¶ 14).  Upon

review, it was determined that Plaintiff held a Political Science Certificate.  (<u>Coyne Aff.</u> at ¶ 9).

Under Ohio's Education Management Information System ("EMIS"), Plaintiff's Certificate

authorized her to teach courses in Government and Politics.  (<u>Id.</u>).  Teaching courses in

Psychology, however, would generate "errors" in EMIS and could ultimately lead to negative

"report cards" to parents in the School District and/or a loss of funding for the School District.

(<u>Id.</u> at ¶¶ 4-5, 9).

   On April 11, 2003, Superintendent Coyne sent an email to members of the Board of

Education regarding the possibility that Plaintiff's teaching contract would not be recommended

for renewal.  (Exhibit 5, attached to <u>Plaintiff's Memorandum in Opposition</u> (Doc. # 48-6); <u>Coyne</u>

<u>Aff.</u> at¶ 15).  In the email, Superintendent Coyne noted that Plaintiff may be recommended for

non-renewal due to her limited Certificate.  (Exhibit 5, attached to <u>Plaintiff's Memorandum in</u>

<u>Opposition</u> (Doc. # 48-6)).  Superintendent Coyne also noted that "the situation is tainted by the

fact that [Plaintiff] presented a class on gay rights ... and would not talk in class because all gay

persons were supposedly keeping quiet...."  (<u>Id.</u>).

   On April 21, 2003, and pursuant to procedures established by Ohio Revised Code §

3319.11 as well as the collective bargaining agreement between the School District and the

Teachers Union, Superintendent Coyne recommended to the Board of Education that Plaintiff's

teaching contract not be renewed.  (<u>Coyne Aff.</u> at ¶ 16).  On April 21, 2003, Plaintiff and her

Union representative, Toni Dymek, met with the members of the Board of Education concerning

her teaching contract.  (<u>Beall Aff.</u> at ¶ 12).  Plaintiff contends that Dymek suggested to the Board

4

of Education that the recommendation that Plaintiff's contract not be renewed was based on her

sexual orientation.  (Beall Dep. at p. 68).  Additionally, Maynor indicated to the Board of

Education that the enrollment numbers for the following year would justify retaining Plaintiff as

a teacher.  (Id. at pp 67-68).

Nevertheless, the Board of Education voted to non-renew Plaintiff's teaching contract.

(Deposition of Nancy Smith at p. 8; Deposition of Marvin Peterson at p. 22; Deposition of

Vicijean Geer at p. 10; Deposition of James Roddy at pp. 9-10)  Following the meeting with the

Board of Education, Plaintiff received written notice that her teaching contract would not be

renewed.  (Beall Aff. at ¶ 13; Exhibit 7, attached to Plaintiff's Memorandum in Opposition (Doc.

# 48-8)).

## II.  Discussion

### A.  Standard

Defendants have moved for summary judgment with respect to Plaintiff's claims.[3]

Although summary judgment should be cautiously invoked, it is an integral part of the Federal

Rules, which are designed "to secure the just, speedy and inexpensive determination of every

action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The

standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

---

[3]As will be discussed *infra*, it does not appear that Defendants have moved for summary
judgment with respect to certain claims asserted against Defendant Coyne in his individual
capacity.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat

6

an otherwise properly supported motion for summary judgment; the requirement is that there be
no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).  A
"material" fact is one that "would have [the] effect of establishing or refuting one of [the]
essential elements of a cause of action or defense asserted by the parties, and would necessarily
affect [the] application of [an] appropriate principle of law to the rights and obligations of the
parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477
U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  See also
Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided,
summary judgment is appropriate if the opposing party fails to make a showing sufficient to
establish the existence of an element essential to that party's case and on which that party will
bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must
demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings." Hall v.
Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position
is insufficient; there must be evidence on which the jury could reasonably find for the opposing

party.  <u>Anderson</u>, 477 U.S. at 252.  The nonmoving party must present "significant probative

evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts."  <u>Moore v. Phillip Morris Companies, Inc.</u>, 8 F.3d 335, 340 (6th Cir. 1993).  The court may,

however, enter summary judgment if it concludes that a fair-minded jury could not return a

verdict in favor of the nonmoving party based on the presented evidence.  <u>Anderson</u>, 477 U.S. at

251-52; <u>Lansing Dairy, Inc.</u>, 39 F.3d at 1347.

**B.  Application**

Plaintiff asserts claims against Defendants under 42 U.S.C. § 1983, which provides in

relevant part as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State ... subjects, or causes to
> be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.  To succeed on a claim under § 1983, Plaintiff must show that (1) a person (2)

acting under color of state law (3) deprived her of rights secured to her by the United States

Constitution or its laws.  <u>Waters v. City of Morristown</u>, 242 F.3d 353, 358-59 (6th Cir. 2001).

**1.  Official Capacity Claims**

Plaintiff has asserted § 1983 claims against Defendant Board of Education.  Local

governing bodies, such as the Board of Education, are "persons" with respect to § 1983 liability.

<u>See Adkins v. Bd. of Educ. of Magoffin County Kentucky</u>, 982 F.2d 952, 957 (6th Cir. 1993).

However, the Board of Education cannot be held liable based on a *respondeat superior* theory.

<u>Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 403-406

(1997)("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation...").  Instead, it is only when the execution of a government's policy or custom inflicts the injury complained of that the government as an entity can be held liable under § 1983.  Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694 (1978).  Thus, the Board of Education can be held liable for having caused a constitutional tort through "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by ... [the Board of Education]'s officers.'" Adkins, 982 F.2d at 957 (quoting Monell, 436 U.S. at 690-91).

Defendants argue that they are entitled to summary judgment because Plaintiff has not identified a policy that caused the alleged constitutional deprivations in this case.  Plaintiff, however, responds that her claims arise out of the decision to non-renew her teaching contract and that such a decision is sufficient, by itself, to establish municipal liability under Monell.

A similar situation was addressed by the Court in Glover v. Williamsburg Local School Dist. Bd. of Ed., 20 F. Supp.2d 1160 (S.D. Ohio 1998).  In that case, a public school teacher, whose contract was not renewed, brought a civil rights action claiming that he was discriminated against based on, *inter alia*, his sexual orientation.  The Court noted that, although the Principal had evaluated the plaintiff, and the Superintendent made a recommendation that the plaintiff's teaching contract not be renewed, neither had final decision-making authority for purposes of § 1983.  Glover, 20 F. Supp.2d at 1168.  The Court therefore held that, in order to establish liability, the plaintiff must show that the Board, itself, discriminated against him when they voted not to renew his contract.  Id.

"[T]he identification of policymaking officials is a question of state law."  City of St.

9

Louis v. Praprotnik, 485 U.S. 112, 124 (1988).  Under Ohio law, a board of education has final

authority to establish employment policy and make contract renewal and non-renewal decisions.

Ohio Revised Code § 3319.11.  See also Hull v. Cuyahoga Valley Joint Vocational School Dist.

Bd. of Educ., 926 F.2d 505, 515 (6th Cir.), cert. denied, 501 U.S. 1261 (1991).  Thus, the

recommendation of Superintendent Coyne cannot, alone, form the basis of a policy resulting in

municipal liability.  See Hull, 926 F.2d at 515.  Instead, Plaintiff must establish that the Board of

Education, itself, discriminated against her when it voted to non-renew her teaching contract, or

alternatively, that the Board of Education ratified Superintendent Coyne's allegedly

discriminatory motive.  See Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986) (even a single

decision or action may trigger municipal liability as long as the decision or action is that of an

authorized, final policymaker); Hull, 926 F.2d at 516; Glover, 20 F. Supp.2d at 1168.

        In this case, Plaintiff has submitted evidence that the Board of Education knew that

Plaintiff was a lesbian and that she had given a controversial presentation regarding the National

Day of Silence prior to rendering its decision to non-renew Plaintiff's teaching contract.  In fact,

Superintendent Coyne sent an email, regarding Plaintiff's presentation on the National Day of

Silence, to members of the Board of Education prior to their decision to non-renew Plaintiff's

contract.  Moreover, there is evidence that the topic of Plaintiff's sexual orientation and/or her

National Day of Silence presentation were discussed on the evening of April 21, 2003, when the

Board of Education met to decide whether to renew Plaintiff's contract.  The Court concludes

that this evidence is sufficient to survive Defendants' motion for summary judgment.

        Plaintiff has also asserted § 1983 claims against Superintendent Coyne in his official

capacity.  A suit against a government employee in his or her official capacity "represent[s] only

10

another way of pleading an action against an entity of which an officer is an agent." Monell, 436

U.S. at 690 n.55.  Thus, if the government agency receives notice of the action and has an

opportunity to respond, an official capacity suit is, in all respects other than name, to be treated

as a suit against the government agency.  Brandon v. Holt, 469 U.S. 464, 471-72 (1985).

Therefore, Plaintiff's official capacity claim against Superintendent Coyne is in fact a claim

directly against the Board of Education.

    Alternatively, Defendants argue that, even if Plaintiff has established a custom or policy

sufficient to establish municipal liability under Monell, Plaintiff has failed to establish a

violation of her constitutional rights.  Plaintiff alleges three violations of her constitutional

rights: (a) violation of her equal protection rights, as protected by the Fourteenth Amendment;

(b) violation of her right to freedom of association, as protected by the First and Fourteenth

Amendments; and (c) violation of her right to academic freedom, or freedom of speech, as

protected by the First Amendment.  The Court will now address those claims.

### a.  Equal Protection

    Plaintiff alleges that Defendants non-renewed her teaching contract because of her sexual

orientation and that such action violated her equal protection rights.  The Equal Protection

Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  The threshold

element of an equal protection claim is disparate treatment.  Glover, 20 F. Supp.2d at 1168.

Once disparate treatment has been shown, the question becomes whether there is a rational

relationship between that treatment and a legitimate government interest.  Id.  However, as

recognized by the Supreme Court, "'a bare ... desire to harm a politically unpopular group cannot

11

constitute a *legitimate* governmental interest.'" Romer v. Evans, 517 U.S. 620, 634-35 (1996)

(quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973) (emphasis added)).

The framework for analyzing claims of discrimination under Title VII is also applicable

to equal protection claims. Glover, 20 F. Supp.2d at 1170 (citations omitted). Absent direct

evidence of discrimination, the burden shifting framework established in McDonnel Douglas

Corp. v. Green, 411 U.S. 792 (1973), will be utilized. Plaintiff has not offered any direct

evidence of discrimination in this case. Instead, Plaintiff relies on circumstantial evidence.

Therefore, this Court will analyze Plaintiff's equal protection claim under the McDonnell

Douglas framework.

Under the McDonnell Douglas framework, Plaintiff must first establish a *prima facie*

case of discrimination by showing that:

> (1)     she is a member of a protected class;
>
> (2)     she was qualified for her position;
>
> (3)     she suffered an adverse employment action; and
>
> (4)     she was replaced by someone outside the protected class.

Glover 20 F. Supp.2d at 1170 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506

(1993)). As noted by the Supreme Court, "[t]he burden of establishing a prima facie case of

disparate treatment is not onerous." Texas Dep't of Community Affairs v. Burdine, 450 U.S.

248, 253 (1981).

Once Plaintiff establishes a *prima facie* case, the burden shifts to Defendants to articulate

a legitimate, nondiscriminatory reason for the adverse employment action. Id. If Defendants

meet this burden, Plaintiff must "produce sufficient evidence from which the jury may

12

reasonably reject the employer's explanation." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994). In other words, Plaintiff must show that the reason offered by Defendants was pretextual.

### i. Protected Class

Plaintiff is a homosexual. (Beall Aff. at ¶ 3). As recognized by the Supreme Court, while homosexuals do not qualify as either suspect or quasi-suspect classes, they nevertheless are entitled to at least the same protection as any other identifiable group which is subject to disparate treatment by the state. Romer, 517 U.S. at 633-36. See also Stemler 126 F.3d 856, 874 (6th Cir. 1997), cert. denied, 523 U.S. 1118 (1998). Defendants concede, for the purpose of their motion for summary judgment, that Plaintiff has established the first element of her *prima facie* case of discrimination.

### ii. Plaintiff's Qualifications

Defendants argue that they are entitled to summary judgment because Plaintiff has failed to prove that she was qualified for her job. Defendants point to the fact that Plaintiff held a limited teaching Certificate and that the School District planned to expand its curriculum. The Sixth Circuit has recognized, however, that a court must not conflate the *prima facie* analysis with the second stage of the McDonnell Douglas inquiry. See Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2001). Thus, the Court should not take into consideration Defendants' alleged legitimate non-discriminatory reason offered for the non-renewal of Plaintiff's contract. Instead, the Court must look to Plaintiff's objective qualifications, including Plaintiff's education, experience, and skills. See Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575-76 (6th Cir. 2003). See also Chitwood v. Dunbar Armored, Inc., 267 F. Supp.2d

751 (S.D. Ohio 2003); <u>McElroy v. Philips Medical Systems North America, Inc.</u>, Nos. 03-6219, 03-6351, 2005 WL 406335, *5 (6th Cir. Feb. 18, 2005); <u>Gunthorpe v. DaimlerChrysler Corp.</u>, No. 02-3840, 2004 WL 232212, *2 (6th Cir. Feb. 3, 2004).

In this case, Plaintiff held a Political Science Certificate. (<u>Coyne Aff.</u> at ¶ 9). Under Ohio's EMIS, Plaintiff's Certificate allowed her to teach courses in Government and Politics. (<u>Coyne Aff.</u> at ¶ 9). However, Plaintiff taught courses in Government, Law and Psychology. Defendants contend that teaching courses in Psychology, for example, would generate "errors" in EMIS and could ultimately lead to negative "report cards" to parents in the School District and/or a loss of funding for the School District. (<u>Coyne Aff.</u> at ¶¶ 4-5, 9).

Nevertheless, this Court concludes that Plaintiff was objectively qualified to teach in the School District. The fact that Plaintiff was hired by Defendant Board of Education, assigned to teach Law and Society, Psychology and American Government, and had her teaching contract subsequently renewed on two occasions, (<u>see Beall Aff.</u> at ¶¶ 2,4; <u>Beall Dep.</u> at pp.34-36; <u>Thompson Dep.</u> at pp. 18-19), significantly undercuts Defendants' contention that Plaintiff was not qualified for her position. In any event, there is no dispute that Plaintiff was fully qualified to teach courses in Government and Politics. Moreover, there is evidence to suggest that there was sufficient student enrollment in the School District to justify a full-time Government teacher. (<u>Beall Dep.</u> at pp. 67-68; <u>Smith Dep.</u> at pp. 30-31;). Under these circumstances, the Court therefore concludes that Plaintiff has satisfied the second element of her *prima facie* case of discrimination.

### iii. Adverse Employment Action

There is no question that Plaintiff was subjected to an adverse employment action.  On April 21, 2003, Defendant Board of Education voted to non-renew Plaintiff's teaching contract with the School District.  It does not appear that Defendants challenge this element of Plaintiff's *prima facie* case.

### iv.  Replaced by Person Outside Protected Class

Defendants also argue that they are entitled to summary judgment because Plaintiff has failed to establish the fourth element of her *prima facie* case.  As was noted *supra*, in order to establish the fourth element of her *prima facie* case, Plaintiff must show that she was replaced by someone outside the protected class.  In this case, Plaintiff alleges that she was replaced by Matthew Edwards, a heterosexual teacher.  (Am. Compl. at ¶ 24).  However, Plaintiff has not produced any evidence to indicate that Edwards is a heterosexual.  In fact, in her deposition, Plaintiff states that she does not have any personal knowledge as to whether or not Edwards is a heterosexual.  (Beall Dep. at p. 76).  Plaintiff has therefore failed to produce any evidence indicating that she was replaced by someone outside the protected class.

Under certain circumstances, however, a plaintiff alleging discrimination can also satisfy the fourth element of a *prima facie* case by showing that she was treated differently from similarly situated individuals outside the protected class.  See Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992).  To be comparable, a non-protected employee must be similarly situated to the plaintiff in all relevant respects.  See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350-53 (6th Cir. 1998); Mitchell, 964 F.2d at 583.

In this case, Plaintiff has submitted evidence that at least one heterosexual teacher

15

employed by Defendant Board of Education maintained employment in the School District despite the fact that the teacher taught lessons which addressed issues concerning homosexuals. (Affidavit of Tamara M. Ortman at¶¶ 3-6).  Tamara Ortman is a heterosexual teacher employed by Defendant Board of Education to teach courses in English and History.  (Id. at ¶¶ 1-2).  It appears that Plaintiff and Ortman are similarly situated in all relevant respects.  For example, both Plaintiff and Ortman reported to Principal Thompson and, ultimately, to Defendant Board of Education.  Additionally, both Plaintiff and Ortman taught lessons involving gay and lesbian issues.

Defendants, however, note that there is no evidence that Ortman, or any other teacher, held a limited teaching certificate that was similar to Plaintiff's.  Defendants therefore contend that Plaintiff has failed to identify any similarly-situated teachers outside the protected class.  However, as was discussed *supra*, a court must not conflate the *prima facie* analysis with the second stage of the McDonnell Douglas inquiry.  See Cline, 206 F.3d at 660-61.  The limited nature of Plaintiff's teaching Certificate is precisely the legitimate, non-discriminatory reason offered by Defendants under the second prong of the McDonnell Douglas burden-shifting framework.

This Court concludes that Plaintiff's evidence, *i.e.* that her contract was non-renewed following a lesson involving gay and lesbian issues while a heterosexual teacher, under the same line of authority/supervision, maintained her employment with the School District following similar lessons involving gay and lesbian issues, is sufficient to create a genuine issue of material fact with respect to whether Plaintiff was treated differently from similarly-situated heterosexual teachers.  Therefore, Plaintiff has established a *prima facie* case of discrimination in violation of

16

the Equal Protection Clause.

### v. Legitimate Non-Discriminatory Reason

The burden now shifts to Defendants to produce a legitimate, non-discriminatory reason for the non-renewal of Plaintiff's teaching contract. Defendants explain that Plaintiff's limited teaching Certificate prevented the Board of Education from following through with its plan to expand the Social Studies curriculum for the School District. This Court agrees that, if true, Defendants' explanation provides a legitimate, non-discriminatory reason for the non-renewal of Plaintiff's teaching contract.

### vi. Pretext

Under the McDonnell Douglas framework, the burden shifts back to Plaintiff to show that Defendants' stated reason for the non-renewal of her contract was actually a pretext for discrimination. In order to show pretext, Plaintiff must show, by a preponderance of the evidence, that: (1) the proffered reason offered by Defendants had no basis in fact, (2) the proffered reason did not actually motivate the decision to non-renew her teaching contract, or (3) the proffered reason was insufficient to motivate such a decision. See Pennington v. Western Atlas, Inc., 202 F.3d 902, 909 (6th Cir.) (quoting Manzer, 29 F.3d at 1084), cert. denied, 531 U.S. 826 (2000).

To establish pretext based on the first category, Plaintiff must produce evidence to show that the proffered reason for the non-renewal of her teaching contract did not actually exist, *i.e.*, that the reason given was factually false. However, there is no dispute that Plaintiff held a limited teaching Certificate. Nor does Plaintiff dispute that Defendants intended to expand the curriculum or that Edwards held a broader teaching Certificate.

17

To establish pretext based on the third category, Plaintiff must offer evidence to show that the proffered reason offered by Defendants was insufficient to actually motivate the non-renewal of her teaching contract. This type of evidence usually "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in [conduct] substantially identical ... to that which the employer contends motivated its discharge of the plaintiff." Manzer, 29 F.3d at 1084. As noted *supra*, Defendant Board of Education contends that Plaintiff's teaching contract was non-renewed based solely on the limited nature of her teaching Certificate. Plaintiff has not identified any other teachers employed by Defendant Board of Education who were outside the protected class, who held similar limited teaching Certificates, and whose teaching contracts were renewed by the Board of Education.

Instead, it appears that Plaintiff is relying on the second category of pretext. To establish pretext under this category, Plaintiff must produce evidence that makes it more likely than not that the proffered reason offered by Defendants did not actually motivate the non-renewal of Plaintiff's teaching contract. Manzer, 29 F.3d at 1084. In this case, Defendants contend that the limited nature of Plaintiff's teaching Certificate was the sole basis for the decision to non-renew her teaching contract. Plaintiff, however, offers several reasons why she believes that her sexual orientation actually motivated the non-renewal of her teaching contract.

First, Plaintiff notes the timing of the recommendation to the Board of Education that Plaintiff's teaching contract be non-renewed. As was discussed *supra*, on March 25, 2003, Principal Thompson indicated that he would recommend that Plaintiff's contract be renewed under a three year contract. (Beall Aff. at ¶ 6; Thompson Dep. at p. 13). On April 9, 2003,

Plaintiff gave her presentation on the National Day of Silence.  Plaintiff contends that Principal Thompson became visibly agitated after viewing a portion of the presentation.  (Beall Aff. at ¶ 8; Beall Dep. at p. 49).  Plaintiff also contends that Principal Thompson compared the presentation to teaching religion; Thompson allegedly stated that the subject was "shaky ground" and that he would have to talk to Bob Smith, Assistant Superintendent in charge of curriculum.  (Beall Aff. at ¶ 8; Beall Dep. at pp. 52-53).  As a result, Plaintiff opted to discontinue the presentation. (Beall Aff. at ¶ 8; Beall Dep. at p. 53).

Shortly thereafter, approximately two days, Plaintiff met with Principal Thompson who advised Plaintiff that he was withdrawing his recommendation for renewal of Plaintiff's teaching contract and would, instead, recommend Plaintiff for non-renewal.  (Beall Aff. at ¶ 9). Additionally, upon learning of the presentation, Superintendent Coyne requested a review of Plaintiff's teaching Certificate and, further, notified the Board of Education of the "tainted situation."  (Exhibit 5, attached to Plaintiff's Memorandum in Opposition (Doc. # 48-6) (informing Board of Education members that "the situation is tainted by the fact that [Plaintiff] presented a class on gay rights ... and would not talk in class because all gay persons were supposedly keeping quiet..."); Coyne Aff. at ¶ 15).

Defendants argue that the timing of the events in this case is not suspect and suggest that "Superintendent Coyne and Principal Thompson discussed on multiple occasions Plaintiff's certification well before April 2003."  (Defendants' Reply at pp. 8-9).  However, if Superintendent Coyne and Principal Thompson did discuss Plaintiff's limited Certificate and the plan to expand the curriculum "well before April 2003," it is unclear why, in late March 2003, Principal Thompson would inform Plaintiff that he would recommend the renewal of her

teaching contract.  In fact, it does not appear that anyone expressed concern to Plaintiff over the limited nature of her teaching Certificate until after she gave a presentation on the National Day of Silence

Moreover, despite Defendants arguments to the contrary, it appears that Plaintiff's sexual orientation and/or her presentation on the National Day of Silence were discussed when the Board of Education met to vote on the renewal of Plaintiff's teaching contract.  This Court therefore concludes that Plaintiff has submitted sufficient evidence to create a genuine issue of material fact with respect to whether Defendants stated reason for the non-renewal of Plaintiff's teaching contract was actually a pretext for discrimination.

### b.  Freedom of Association

Next, Plaintiff alleges that Defendants violated her right to freedom of association.  The Constitution safeguards two types of freedom of association: (1) freedom to enter into and maintain certain intimate associations, and (2) freedom to associate for the purpose of engaging in those activities protected by the First Amendment.  Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).  See also Marcum v. McWhorter, 308 F.3d 635, 639 (6th Cir. 2002).  It appears that Plaintiff's claim in this case involves her freedom of intimate association.

The freedom of intimate association protects an individual's right to maintain certain intimate human relationships that "attend the creation and sustenance of a family - marriage, childbirth, the raising and education of children, and cohabitation with one's relatives."  Roberts, 468 U.S. at 619.  The decision to enter into and/or maintain such relationships must be secured against undue intrusion by the State.  Akers v. McGinnis, 352 F.3d 1030, 1039-40 (6th Cir. 2003), cert. denied, 543 U.S. 1020 (2004).  Thus, as recognized by the Sixth Circuit, a "direct

20

and substantial interference" with intimate association is subject to strict scrutiny, while lesser

interferences merely merit rational-basis review.  Id. at 1040.

Defendants argue that they are entitled to summary judgment with respect to this claim

because Plaintiff has failed to allege how Defendant Board of Education or Defendant Coyne

obstructed her right to intimate association.  Defendants note that, according to Plaintiff, Plaintiff

and her life partner attended various school functions over the course of her employment in the

School District.  (Beall Dep. at pp. 80-82).  Plaintiff, however, has not responded to Defendants'

motion for summary judgment in this regard and appears to have abandoned her intimate

association claim.  (See Plaintiff's Memorandum in Opposition at pp. 2-3).  Under these

circumstances, the Court concludes that Defendants are entitled to summary judgment on

Plaintiff's freedom of intimate association claim.

### c.  Academic Freedom

Finally, Plaintiff contends that Defendants violated her academic freedom, or right to free

speech, by not renewing her teaching contract following her presentation on the National Day of

Silence.  Plaintiff can establish a *prima facie* case of First Amendment retaliation by showing

that:

> (1)    she was engaged in a constitutionally protected activity;
>
> (2)    Defendants' adverse action caused her to suffer an injury
>        that would likely chill a person of ordinary firmness from
>        continuing to engage in that activity; and
>
> (3)    the adverse action was motivated at least in part as a
>        response to the exercise of her constitutional rights.

Cockrel v. Shelby County School Dist., 270 F.3d 1036, 1048 (6th Cir. 2001), cert. denied, 537

U.S. 813 (2002).  If Plaintiff can establish the three elements of her *prima facie* case, the burden

of persuasion shifts to Defendants who must show, by a preponderance of the evidence, that they would have taken the same action even in the absence of the protected conduct. Id.

As the Sixth Circuit has recognized, "[b]ecause the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of 'public concern,'" and will therefore qualify as a constitutionally protected activity. Hardy v. Jefferson Community College, 260 F.3d 671, 679 (6th Cir. 2001), cert. denied, 535 U.S. 970 (2002). Moreover, there is no question that non-renewal of a teaching contract is "'an injury that would likely chill a person of ordinary firmness from continuing in [the] activity.'" Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Village School Dist., 428 F.3d 223, 232 (6th Cir. 2005) (quoting Cockrel, 270 F.3d at 1048, 1055). Defendants apparently concede that Plaintiff has established the first two elements of her prima facie case. (Motion for Summary Judgment at pp. 12-13).

Instead, Defendants argue that Plaintiff has failed to establish the third element of a prima facie case of First Amendment retaliation. In order to establish the third element of her prime facie case, Plaintiff must "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." Rodgers v. Banks, 344 F.3d 587, 602 (6th Cir. 2003) (quotations omitted). Specifically, Plaintiff must show that there is a causal connection between the non-renewal of her teaching contract and her presentation on the National Day of Silence. The Court notes, however, that temporal proximity, alone, is not enough to establish a causal connection with respect to a First Amendment retaliation claim. See Cockrel, 270 F.3d at 1055; Smith v. Campbell, 250 F.3d 1032, 1038 (6th Cir. 2001).

Defendants argue that Plaintiff cannot establish a causal connection between her National

22

Day of Silence presentation and the Board of Education's decision to non-renew her teaching

contract.  Defendants contend that the decision to non-renew Plaintiff's teaching contract was

based solely on Plaintiff's limited teaching Certificate.  Plaintiff, however, argues that the facts

in this case suggest that a reasonable juror could conclude that the decision to non-renew

Plaintiff's teaching contract was motivated, at least in part, by animus towards her for exercising

her free speech rights.  This Court agrees.

      As was discussed *supra*, the timing of the events in this case suggest that Plaintiff's

limited teaching Certificate may not have been the actual motivation for the decision to non-

renew her teaching contract.  On March 25, 2003, Plaintiff was evaluated by Principal

Thompson, who recommended that Plaintiff be rehired by the Board of Education under a three

year contract.  (Beall Aff. at ¶ 6; Thompson Dep. at p. 13).  Shortly thereafter, Plaintiff gave a

presentation on the National Day of Silence to two of her Government classes.  Two days

following the presentation, Plaintiff met with Principal Thompson who advised Plaintiff that he

was withdrawing his recommendation for renewal of Plaintiff's teaching contract and would,

instead, recommend Plaintiff for non-renewal.  (Beall Aff. at ¶ 9).  Additionally, upon learning

of the presentation, Superintendent Coyne requested a review of Plaintiff's teaching Certificate

and, further, notified the Board of Education of the "tainted situation."  (Exhibit 5, attached to

Plaintiff's Memorandum in Opposition (Doc. # 48-6) (informing Board of Education members

that "the situation is tainted by the fact that [Plaintiff] presented a class on gay rights ... and

would not talk in class because all gay persons were supposedly keeping quiet..."); Coyne Aff.

at ¶ 15).

      Moreover, there is evidence that the topic of Plaintiff's sexual orientation and/or her

National Day of Silence presentation were discussed on April 21, 2003, when the Board of Education met to decide whether to renew Plaintiff's contract.  Further, at least one Board of Education member testified that there was some "controversy" surrounding Plaintiff's National Day of Silence presentation.  (Roddy Dep. at pp. 17-18).  Under these circumstances, the Court concludes that Plaintiff has presented sufficient evidence to create a genuine issue of material fact with respect to whether Plaintiff's teaching contract was non-renewed, at least in part, because of her presentation on the National Day of Silence.

The burden of persuasion now shifts to Defendants to establish that they would have taken the same action even if Plaintiff had not engaged in protected speech.  Leary, 349 F.3d at 898; Cockrel, 270 F.3d at 1056.  As noted in Cockrel, Defendants' burden at this stage is substantially higher: to be entitled to summary judgment, Defendants may not simply bring forth enough evidence to allow a jury to find that Defendants would have non-renewed Plaintiff's contract regardless of her speech, because all reasonable inferences must be drawn in a light most favorable to Plaintiff.  See Cockrel, 270 F.3d at 1056 (citing 11 James William Moore *et al.*, Moore's Federal Practice, § 56.13[1], at 56-138 (3d ed. 2000) (stating that, if the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.")).

Defendants have not met their burden in this respect.  See Cockrel, 270 F.3d at 1056 (citing Hunt v. Cromartie, 526 U.S. 541, 553 (1999) ("[s]ummary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible of different

24

interpretations or inferences by the trier of fact")).  Defendants merely rely on the same evidence used to support their contention that the non-renewal of Plaintiff's contract was not related to her protected speech.  As was discussed *supra*, a genuine issue of material fact exists with respect to whether the non-renewal of Plaintiff's teaching contract was motivated, at least in part, by her presentation on the National Day of Silence.  Therefore the Court cannot conclude that Defendants are entitled to summary judgment with respect to this claim.

### 2. Individual Capacity Claims

Plaintiff also asserts claims against Superintendent Coyne in his individual capacity.  It appears that Plaintiff's § 1983 claims against Superintendent Coyne in his individual capacity are based on the same alleged constitutional violations that were discussed *supra*, *i.e.*, (a) violation of Plaintiff's equal protection rights, as protected by the Fourteenth Amendment; (b) violation of Plaintiff's freedom of association, as protected by the First and Fourteenth Amendments; and (c) violation of Plaintiff's academic freedom, or freedom of speech, as protected by the First Amendment.  Defendant Coyne moves for summary judgment arguing, generally, that he is entitled to qualified immunity.  However, Superintendent Coyne appears to address only the alleged violation of Plaintiff's equal protection rights.[4]  This Court will therefore only address the defense of qualified immunity in the context of Plaintiff's equal protection claim.

### a. Qualified Immunity

_____

[4]Similarly, Plaintiff limits her discussion of qualified immunity to the alleged equal protection violation.

25

Government officials sued in their individual capacities are entitled to seek qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity extends to individuals performing discretionary functions, unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Id. Such a right is "clearly established" if "a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The United States Court of Appeals for the Sixth Circuit has developed a three-part test to determine when a government official is entitled to qualified immunity: first, the Court must view the facts in a light most favorable to Plaintiff in determining whether a constitutional violation occurred; next, the Court must determine whether the right was "clearly established," *i.e.,* one of which a reasonable officer would have known; and finally, the Court must determine whether the officer's actions were objectively reasonable in light of that clearly established right. Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003); Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir. 2002).

In this case, Plaintiff alleges that Superintendent Coyne violated her equal protection rights by recommending to the Board of Education that Plaintiff's teaching contract be non-renewed. Plaintiff contends that Superintendent Coyne's actions were impermissibly based on Plaintiff's sexual orientation. Defendant Coyne, on the other hand, contends that his recommendation was based solely on Plaintiff's limited teaching Certificate, and not on her sexual orientation.

As was discussed *supra*, this Court has concluded that Plaintiff has presented sufficient evidence to create a genuine issue of material fact with respect to whether the decision to non-

26

renew her teaching contract was impermissibly based on her sexual orientation.  For the same reasons, this Court concludes that genuine issues of material fact exist as to whether Defendant Coyne recommended non-renewal of Plaintiff's teaching contract based on Plaintiff's sexual orientation.  This Court therefore concludes, viewing the facts in a light most favorable to Plaintiff, that Plaintiff has established a violation of her right to equal protection of the laws as protected by the Fourteenth Amendment.

Next, the Court must determine whether the right to equal protection alleged by Plaintiff was "clearly established" and whether Defendant Coyne acted in an objectively reasonable manner.  It is clearly established that homosexuals, as a class, are entitled to equal protection of the laws.  Romer, 517 U.S. at 633-36; Stemler 126 F.3d 856, 874.  Moreover, discrimination based on sexual orientation cannot be described as objectively reasonable.  Romer, 517 U.S. at 634-35 ("a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest") (quotations omitted).  Thus, if Defendant Coyne's recommendation was actually based on Plaintiff's sexual orientation, he would not be entitled to qualified immunity.  Because a genuine issue of material fact exists in this regard, the Court cannot conclude that Defendant Coyne is entitled to qualified immunity with respect to Plaintiff's equal protection claim.

**WHEREUPON**, Defendants' motion for summary judgment (Doc. # 34) is **GRANTED**

in part and **DENIED** in part.  With respect to Plaintiff's freedom of association claim, asserted

against Defendant Board of Education and Defendant Coyne in his official and individual

capacities, Defendants' motion for summary judgment is **GRANTED**.  With respect to

Plaintiff's remaining claims, *i.e.*, her equal protection and academic freedom claims, asserted

against Defendant Board of Education and Defendant Coyne in his official and individual

capacities, Defendants' motion for summary judgment is **DENIED**.


**IT IS SO ORDERED.**


June 8, 2006                                    /s/ John D. Holschuh
                                               John D. Holschuh, Judge
                                               United States District Court


28